# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

BONNIE MARIE HODGES,

    Plaintiff,

v.                                          Case No. 18-CV-1547

ANDREW M. SAUL[1],
Commissioner of Social Security,

    Defendant.

## DECISION AND ORDER

**1. Procedural History**

Bonnie Marie Hodges, alleging she has been disabled since July 28, 2014, seeks Social Security Disability Insurance benefits. The Commissioner's final decision denying her claim for benefits is set forth in the November 1, 2017 decision of an administrative law judge (ALJ). (Tr. 14-23.) Following a hearing, the ALJ found that Hodges suffered from "fibromyalgia, poly-arthralgia, cervical disc disease, cervical radiculopathy, temporomandibular joint syndrome, adjustment disorder and depressive disorder with some anxiety." (Tr. 17.) She concluded that Hodges had

---

[1] As of June 4, 2019, Andrew M. Saul is the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), he is substituted as the named defendant in this action.

the residual functional capacity to perform light work as defined in 20 CFR 404.1567(h) except she needs the option to sit every 45 minutes for one to five minutes, but can continue working while seated. She can occasionally stoop, kneel, crawl, crouch, and climb ramps or stairs. She cannot climb ladders, ropes or scaffolds. She must avoid extreme cold temperatures such as refrigerated environments, and hazards such as heights and large moving machinery. She can perform simple, routine tasks.

(Tr. 18.)

Based on the testimony of a vocational expert, the ALJ concluded that Hodges was not disabled because "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. 22.)

**2. Standard of Review**

The court's role in reviewing the ALJ's decision is limited. It does not look at the evidence anew and make an independent determination as to whether the claimant is disabled. Rather, the court must affirm the ALJ's decision if it is supported by substantial evidence. *Moore*, 743 F.3d at 1120. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1120-21 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Thus, it is possible that opposing conclusions both can be supported by substantial evidence. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). If the ALJ committed a material error of law, however, the court cannot affirm the ALJ's decision regardless of whether it is supported by

2

substantial evidence. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014); *Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012).

**3. Analysis**

**3.1. Headaches**

The ALJ stated, "The medical records note subjective complaints of headaches with various possible etiologies, but they do not suggest debilitating severity. *(E.g.,* Ex. 8F; Ex. 13F; Ex. 16F; Ex. 21F.)" (Tr. 20.) It is unclear for what purpose the ALJ cited roughly 200 pages of medical records other than if it was to show simply that Hodges complained of headaches. But it is the second clause of the quoted sentence—that Hodges' headaches "do not suggest debilitating severity"—that is most relevant to the court. Absent additional explanation or a citation to specific pages, the court cannot say that the ALJ complied with her obligation to explain why she believed these roughly 200 pages of medical records suggest Hodges's headaches were non-debilitating.

In fact, there are many statements in the medical records cited by the ALJ that tend to support a finding that the headaches are severe and would impair her ability to work. (*See, e.g.*, Tr. 647 (noting "severe headaches" two to six days per week, sometimes accompanied by nausea and vomiting); 661 ("Headaches are also quite significant, and pain on a 0-10 scale ranges from 3-10 and averages 7. The base of her neck is the most involved area. 'Meds make me fatigued at work, work makes pain worse, and I don't know what to do.'"); 770 ("She still has significant headaches and neck pain, with pain

ranging from 6-10 and averaging 8 on a 0-10 scale."); 777 ("She has significant headaches two to three times per week."); 899 ("She has had headaches for the past 7 years. Pain is constant but varies in intensity. Pain is described as throbbing, stabbing, shooting, hot, sharp, achy and tingling. Pain is rated as 6/10 at best and 10/10 at worst. Average pain rating is 6-8/10. It gets worse as the day progresses. Worse with physical activity and emotional stress."); 1077 ("Patient states that she has been having more headaches. States that the headaches even make her nauseated at times.").) Hodges kept a headache diary from August 2015 to January 2017. (Tr. 965-980.)

The only specific explanation the ALJ offered for her conclusion that Hodges's headaches were not debilitating was to observe that she "has not required emergency treatment for headache relief." (Tr. 20.) Not only is this rationale not supported by medical evidence—for example, no medical professional said that a person with severe headaches would be expected to seek emergency treatment--it is contrary to common sense. A lay person would not expect chronic headaches to warrant emergency treatment. In fact, that would seemingly be the case of any chronic condition, with "chronic" describing a condition that is always there, or reoccurs and never completely goes away. A person suffering from a chronic condition may reasonably presume that suffering yet another day of pain does not present a medical emergency. *See Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013) ("[W]e do not understand the Commissioner's point; a person suffering continuous pain might seek unscheduled treatment if that pain

4

unpredictably spikes to a level which is intolerable, but otherwise why would an emergency-room visit be sensible? Unless emergency treatment can be expected to result in *relief*, unscheduled treatment in fact makes no sense.").

Hodges's headaches were a persistent complaint and a significant aspect of her claim of disability. It was error for the ALJ to dismiss them without providing a good reason for doing so. This error was material; if Hodges suffered headaches of the frequency and severity she alleged, they may result in absenteeism or time off task that would be work preclusive. (*See, e.g.*, Tr. 53 (vocational expert testimony that an employer would tolerate a maximum of two absences per month and ten percent of a workday off-task).) Consequently, the court finds that remand is required for reassessment of Hodges's complaints of headaches.

### 3.2. Cherry-Picking

Hodges argues that the ALJ impermissibly cherry-picked the evidence. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)); *see also Stephens v. Berryhill*, 888 F.3d 323, 329 (7th Cir. 2018) ("The ALJ may not select and discuss only that evidence that favors [her] ultimate conclusion but must confront the evidence that does not support [her]

conclusion and explain why it was rejected." (internal citations and quotation marks omitted)).

For example, Hodges contends the ALJ referred to a June 2013 cervical spine "scan" showing "moderate degenerative disease with mild to moderate stenosis that varied with positioning" (Tr. 19), but ignored a "scan" from a month later. Hodges contends that, read together, the scans reveal progressive degeneration over the span of time between the scans. (ECF No. 13 at 11.) The ALJ also relied on evidence showing that Hodges had normal strength, gait, balance, and reflexes to discredit her complaints. But, Hodges argues, she never alleged that her cervical spine problems produced these symptoms. (ECF No. 13 at 12.) And the ALJ noted evidence that Hodges exhibited only "mild pain behaviors" but overlooked evidence that she had an "extremely high pain threshold." (ECF No. 13 at 12.)

With respect to the "scans" in June and July of 2013, Hodges mischaracterizes the evidence. The June "scan" was an X-ray of her cervical spine on June 27, 2013. (Tr. 487.) The examining physician recommended additional imaging. (Tr. 487.) This additional imaging, an MRI, was done eight days later, on July 5, 2013. (Tr. 488-89.) Rather than suggesting that Hodges's condition deteriorated in the eight days since the X-ray, the MRI merely provided more detail as to her condition. But, more importantly, the ALJ did not overlook the July 5, 2013 MRI. Although the ALJ did not cite the report of the MRI discussed at pages 488-89 of the transcript, she did cite to "Ex. 12F/10-14," which

corresponds to pages 749 through 753 of the transcript and includes a more thorough imaging report from the July 5, 2013 MRI (Tr. 749-51) as well as a report of an October 24, 2014 MRI (Tr. 752-53). Thus, there is no merit to Hodges's contention that the ALJ ignored the July 5, 2013 MRI.

The ALJ also noted that "the weight of the evidence does not support a finding that the claimant is as limited as alleged. For example, although the claimant's exams note tenderness and occasional deficits in neck range of motion, the weight of her exams described normal strength, gait, balance, reflexes and sensation without or with no more than mild pain behaviors." (Tr. 20.) Hodges argues that this observation was "counterintuitive;" her cervical spine problems and fibromyalgia would not be expected to produce these sorts of symptoms. (ECF No. 13 at 12.)

It might be true that Hodges's impairments would not be expected to result in limitations in these domains. But Hodges reported limitations in these domains. (*See, e.g.,* Tr. 307 (reporting limitations in walking) 305 (third-party questionnaire reporting limitations in, *e.g.*, lifting, bending, standing, sitting, walking, etc.); 449 (reporting "[w]eakness and tightness in legs when walking (esp. left side)"); 533 (reporting "[h]er balance feels off ...."); 620 (checking boxes indicating "Balance Problems," "Sensory changes, e.g. numbness or pins and needles," and "Radiating leg pain"); 687 (reporting weakness in both arms) 689 (reporting regarding "Imbalance/gait abnormality," "Yes: walks in to walls and cuts corners too soon," and regarding "Weakness," "Yes: R hand

7

weakness, drops objects") 758 (noting "[b]ilateral hand pain"); 1003 (reporting "[m]uscle pain and weakness walking up stairs"); 1005 (reporting "[w]alking at the store for 1.5 hours increases leg pain and weakness"); 1006 (reporting "[l]eg weakness and difficulty walking"); 1013 (reporting "[w]eakness in legs"); 1014 (reporting "[w]alking at the store for 3 hours caused increased right hip pain, leg weakness, and fatigue"); 1016 (reporting "[l]eg pain and weakness"); 1025 (reporting "[w]eakness when walking up stairs"); 1038 (reporting "[s]ore and weak / tired legs"); 1046 (reporting "[w]eakness in legs").)

If it is true, as Hodges argues in her brief and reply, that her impairments would not be expected to result in the limitations she reported, then it is no surprise that her reports were not supported by objective testing. The fact that Hodges's subjective complaints were not borne out in objective testing is relevant to the ALJ's conclusion that "the evidence does not support a finding that the claimant is as limited as alleged." The ALJ did not err in noting this inconsistency and relying on it to assess the severity of Hodges's symptoms. *See* SSR 16-3p.

### 3.3. ALJ's "Medical Opinion"

It is well-established that an ALJ may not "play doctor." *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018). An ALJ must rely on medical experts to interpret medical evidence. *Id.* Hodges argues that the ALJ offered an inappropriate medical opinion

8

when he characterized Hodges's medical treatment as "generally conservative in nature." (ECF No. 13 at 14 (quoting Tr. 20).)

To the extent that Hodges's argument is that characterizing treatment as "conservative" is a conclusion only a medical professional can offer, the court rejects the argument. In fulfilling her obligation to adequately explain her decision, an ALJ can be expected to characterize the sort of treatment the claimant received. To characterize treatment as "conservative" is an assessment an ALJ can make. *See Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013) (describing "anti-inflammatories, chiropractic treatment, and physical therapy" as "conservative therapy" without suggesting that the use of the term required medical expertise).

Hodges may also be arguing that it was factually inaccurate for the ALJ to refer to Hodges's treatment as "conservative." She points to *Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013), where the Court of Appeals stated:

> Schomas indeed *began* with conservative therapy, such as over-the-counter anti-inflammatories, chiropractic treatment, and physical therapy. But over time his treatment became more aggressive. Schomas was prescribed narcotic pain relievers, submitted to steroid injections, and finally underwent major surgery. Those treatments belie the ALJ's conclusion that Schomas was treated conservatively.

*Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013) (emphasis in original).

Quibbles over adjectives are not the sorts of matters that ordinarily merit remand. Adjectives such as "conservative" or "aggressive" are by their nature

9

ambiguous. Whether treatment is best characterized or "conservative" or "aggressive" may depend on the overall context and be subject to reasonable disagreements such that the court cannot say that the use of the term was not supported by substantial evidence. It is unlikely that a court could say that an ALJ errs as a matter of law if he describes treatment as "conservative." An ALJ's use of "conservative" matters only insofar as it might suggest a misunderstanding or disregard of the evidence or constitute an error of law. Contrary to *Schomas,* where the ALJ used "conservative" to describe treatment that included "major surgery," here the ALJ could have reasonably described Hodges's treatment as "conservative" in that she has not resorted to interventions such as spinal surgery (although surgery was recommended at points, she was not interested in it (Tr. 493; 532, 648, 744)). Consequently, the court finds this argument is not an additional basis for remand.

### 3.4. Dr. Gorelick

The ALJ stated:

The undersigned has considered the notes of Jeffrey Gorelick, M.D., who indicated that the claimant had "significant functional limitations" and recommended she remain off work indefinitely. (E.g., Ex. 13F/4, 9.[2]) The opinion of significant functional limitations supports a finding of severe impairments, but it is too vague to assist in development of a function-by-function residual capacity. To the extent that Dr. Gorelick's recommendation implies that the claimant is unable to perform any substantial gainful activity, this opinion is on an issue reserved to the Commissioner and requires legal conclusions and vocational

---

[2] The relevant statement is actually found on pages 3 and 8 of Exhibit 13F, corresponding to pages 758 and 763 of the administrative transcript.

considerations outside the expertise of a medical doctor. 20 CFR 404.1527(d). To that extent, the opinion has been given only slight weight as a subjective statement of the severity of the claimant's impairments.

(Tr. 20-21.)

Hodges argues that the ALJ erred by dismissing Dr. Gorelick's opinion that she should be off work indefinitely because it was an opinion on an issue reserved for the Commissioner. *See* 20 C.F.R. § 404.1527(d)(1), (2). If this is what the ALJ had done, it would be error. *See Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012). An ALJ must still consider the opinion. *Id.; see also Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013).

But the court does not read the ALJ's decision as discounting Dr. Gorelick's opinion simply because it was offered on an opinion reserved for the Commissioner. Rather, the ALJ said she was giving Dr. Gorelick's opinion only "slight weight" because "it is too vague to assist in development of a function-by-function residual capacity."

The court understands the ALJ to have been observing that Dr. Gorelick did not complete the sort of form commonly completed by treating sources in social security claims whereby the treating physician offers an opinion as to his patient's abilities in certain domains, such as lifting, standing, sitting, walking, etc. Although Dr. Gorelick offered more than a bald conclusion that he believed Hodges was unable to work—recounting her medical history, his observations from a physical exam, his diagnoses, and recommendations for further treatment—he did not translate these opinions and observations into an opinion as to Hodges's functional capacity. The ALJ could

11

appropriately discount Dr. Gorelick's opinion due to this lack of specificity and supporting detail for his opinion. *See* 20 C.F.R. § 404.1527(c)(3).

**4. Conclusion**

The ALJ erred in her assessment of Hodges's headaches. **IT IS THEREFORE ORDERED** that the Commissioner's decision is **reversed**, and pursuant to 42 U.S.C. § 405(g), sentence four, this matter is **remanded** for further rulings consistent with this decision. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 11th day of October, 2019.

WILLIAM E. DUFFIN
U.S. Magistrate Judge